1
2
3
4
5
6
7

8                    UNITED STATES DISTRICT COURT

9             FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   CARBON AUTONOMOUS ROBOTIC              No.  2:24-cv-03012-DAD-JDP
     SYSTEMS INC.,
12
                  Plaintiff,
13                                          ORDER GRANTING PLAINTIFF'S MOTION
           v.                               FOR A PRELIMINARY INJUNCTION AND
14                                          GRANTING DEFENSE COUNSEL'S
     LAUDANDO & ASSOCIATES LLC,             RENEWED MOTION TO WITHDRAW
15
                  Defendant.                (Doc. Nos. 49, 52, 72)
16

17   ────────────────────────────

18   LAUDANDO & ASSOCIATES LLC,

19                  Counter Claimant,

20         v.

21   CARBON AUTONOMOUS ROBOTIC
     SYSTEMS INC.,
22
                  Counter Defendant.
23   ────────────────────────────

24         This matter came before the court on May 20, 2025 for a hearing on plaintiff's motion for

25   a preliminary injunction filed on April 8, 2025.  (Doc. No. 49.)  Attorneys Chandrika Vira, Ralph

26   Wilson Powers III, Steven Pappas, and Richard A. Crudo appeared at the hearing by video on

27   behalf of plaintiff.  Attorneys Joel Lin and Michael M. Powell appeared at the hearing by video

28   /////

                                              1

1   on behalf of defendant.  For the reasons explained below, the court will grant plaintiff's motion

2   for a preliminary injunction.[1]

3                                    **BACKGROUND**[2]

4           Plaintiff and counter-defendant Carbon Autonomous Robotic Systems Inc. brings this

5   patent infringement action against defendant and counterclaimant Laudando & Associates LLC

6   ("L&A").  (Doc. No. 46.)  Plaintiff was founded by Paul Mikesell, a named inventor on several

7   United States patents, specifically U.S. Patent No. 12,219,948 ("the '948 patent") and U.S. Patent

8   No. 12,240,372 ("the '372 patent").  (Doc. No. 49-5 at ¶ 3.)  In relevant part for purposes of the

9   pending motion, plaintiff alleges that defendant's products infringe upon the '948 patent and the

10  '372 patent.  (Doc. No. 46 at ¶¶ 88–168.)

11          In February 2022, plaintiff launched the first generation of its LaserWeeder product.

12  (Doc. No. 49-5 at ¶ 12.)  The LaserWeeder product is a system incorporating several high-

13  resolution cameras and lasers which is then mounted on a tractor to be moved over a field.  (Doc.

14  No. 49-2 at ¶ 35.)  The system incorporates computer vision software implemented as a neural

15  network which analyzes the images that the cameras receive to distinguish between weeds and

16  desirable plants.  (*Id.*)  Once the computer vision software identifies a weed, the LaserWeeder

17  directs the lasers within the system to shoot and destroy the weed.  (*Id.* at ¶ 37.)  The

18  LaserWeeder system also incorporates multiple safety features, such as emergency stop buttons,

19  safety lights, and a remote control operator.  (*Id.* at ¶ 38.)  In 2025, plaintiff launched the second

20  generation of the LaserWeeder product (the "G2 product") which is more modular to allow for

21  multiple configurations of the system.  (*Id.* at ¶ 39.)  The G2 product incorporates additional

22  safety features including multiple emergency stop buttons, laser emission indicator lights, a key

23  control mechanism, and mechanical hard stops to prevent the laser from exiting outside of desired

24  _____

25  [1] At the May 20, 2025 hearing, defendant's counsel orally renewed its motion to withdraw as
    counsel of record for defendant L&A (Doc. No. 52) which the court had previously denied
26  without prejudice.  (Doc. No. 64.)  The court will address counsel's renewed motion at the
    conclusion of this order.

27
    [2] The following facts are drawn from the declarations filed in support of and in opposition to the
28  pending motion, and the exhibits attached thereto.  (Doc. Nos. 49-2–9, 58-1, 58-2, 61-1, 61-2.)

                                              2

1    limits.  (*Id.*)  The G2 product also uses a laser, camera, and software system to identify and

2    eliminate weeds.  (*Id.*; *see generally* Doc. No. 49-5 at 173–223) (the manual for the G2 product).

3              In support of its motion for preliminary injunction, plaintiff provides an expert declaration

4    from Paul R. Weckler, who possesses a Ph.D. in agricultural engineering from Oklahoma State

5    University where he now works as a professor of biosystems and agricultural engineering.  (Doc.

6    No. 49-6 at ¶¶ 7, 8.)  In that declaration, Dr. Weckler explains that the G2 product practices the

7    claims of the '948 and '372 patents.  (Doc. No. 49-6 at 20.)  The '948 patent's first independent

8    claim is as follows:

9              A system for damaging or killing weeds, the system comprising:
10             [1.1] a camera configured to capture images of plants in a field; [1.2]
             a light source configured to emit a light beam with a wavelength
11             within a range from 300 nm to 100 [micro]meters; a control system
             comprising:  [1.3] a first actuator and a first mirror for directing a
12             path of the light beam, [1.4] a second actuator and a second mirror
             for directing the path of the light beam, [1.5] wherein the control
13             system is configured to direct the path of the light beam towards a
             target using the first and second mirrors; [1.6] a housing configured
14             to at least partially enclose the light source and the control system;
             [1.7] a computing system; and [1.8] a frame configured to move over
15             the field, wherein the camera, the housing, the light source, the
             control system, and the computing system are supported, directly or
16             indirectly by the frame, wherein the computing system is configured
             to perform operations comprising:  [1.9] receiving an image of at
17             least one plant in the field captured by the camera at a first time,
             [1.10] detecting a weed in the image of the at least one plant, wherein
18             the detecting is performed using a neural network configured to
             differentiate between a weed and a crop, [1.11] predicting a target
19             location of the weed in the field at a second time later than the first
             time, wherein the predicted target location accounts for motion of the
20             camera relative to the weed during an elapsed time between the first
             time and the second time, [1.12] causing one or both of the first or
21             second actuators to control one or both of the first or second mirrors
             to direct the path of the light beam toward the predicted target
22             location of the weed in the field, [1.13] causing the light source to
             emit the light beam along the path towards the predicted target

23             location of the weed, and [1.14] causing the light source to continue
             emitting the light beam for a length of time sufficient to damage or
24             kill the weed.

25    (Doc. No. 49-6 at 370–71.)  The '372's first independent claim is as follows:

26             A system for illuminating and targeting a plant in a field, the system
             comprising:  [2.1] a lighting array comprising a plurality of lights,
27             wherein  the lighting array is configured to illuminate a region of
             interest in the field to reduce or eliminate shadows in the region of
28             interest, and wherein the region of interest includes the plant; and a

3

1
2
3
4

> detection system comprising: [2.2] a camera configured to obtain an image of the region of interest, wherein the image depicts the plant, [2.3] one or more processors configured to determine a target location of the plant in the region of interest based on the image of the region of interest obtained by the camera, and [2.4] a light source configured to emit a light beam toward the target location of the plant to damage or kill the plant.

5   (*Id.* at 407.)[3]  Though other companies have developed products to target weeds using computer

6   vision or other similar precision-enhancing technology, plaintiff was the only company to have

7   developed a laser-based weeding product for sale in the United States prior to defendant's

8   announcement of its laser-based weeding product.  (Doc. No. 49-2 at ¶¶ 64, 65.)

9        On September 19, 2023, defendant Laudando & Associates announced that it had

10  developed a laser-based weeding product called the "L&Aser Module" (the "Accused Product").[4]

11  (Doc. No. 49-5 at ¶ 33.)  The Accused Product may be used in a variety of configurations,

12  including with a tractor.  (Doc. No. 49-6 at ¶ 67.)  The inventor of the Accused Product has stated

13  that it is covered by a pending patent which was filed after plaintiff filed its applications for

14  patents covering the LaserWeeder G1 line.  (Doc. No. 49-5 at ¶ 35.)

15  /////

16  _____

17  [3]  Throughout its motion, plaintiff defines the terms within these claims by their ordinary and customary meaning.  (Doc. No. 49-1 at 10; 49-6 at ¶ 46.)  Defendant does not offer an alternative
18  claim construction proposal.  Accordingly, the court will interpret the claim terms in the '948 and '372 patents by their ordinary and customary meaning for purposes of plaintiff's motion.  *See*
19  *Maxwell Techs. v. Nesscap, Inc.*, 508 F. Supp. 2d 837, 842–43 (S.D. Cal. 2007) ("[A] district court may issue a 'tentative' or 'rolling' claim construction when faced with the task of claim
20  construction on an expedited basis."); *see also Omega Eng'g v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003) ("We indulge a 'heavy presumption' that claim terms carry their full
21  ordinary and customary meaning . . . unless the patentee unequivocally imparted a novel meaning to those terms or expressly relinquished claim scope during prosecution[.]"); *Phillips v. AWH*
22  *Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) ("[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at
23  the time of the invention, i.e., as of the effective filing date of the patent application.").
24
25  [4]  During the hearing on the pending motion, the parties disagreed on how to characterize the Accused Product.  Plaintiff defined the Accused Product as being all products from the L&Aser
26  Module product line, whereas defendant defined the Accused Product to be a combination of the L&Aser Module and its accompanying software package called AgCeption.  Throughout this
27  order, the court conducts its analysis following the definition that plaintiff's expert employed in his analysis:  The Accused Product is the L&Aser Module configured to operate with the
28  AgCeption software.  (Doc. No. 49-6 at ¶ 67.)

1      Dr. Weckler analyzed the depictions of the Accused Product in forming an opinion as to

2   whether the Accused Product infringes on the '948 or '372 patents.  (Doc. No. 49-6 at ¶ 16.)  It

3   appears that Dr. Weckler analyzed multiple videos and photos of the Accused Product, including

4   photos showing the interior of the Accused Product, but did not perform physical analysis on a

5   unit of the Accused Product itself.[5]  (*See id.* at 335–47.)  Based upon this review, Dr. Weckler

6   found that the Accused Product has an outer housing which contains a laser source, two actuators,

7   and two mirrors to guide a laser to the location of a weed.  (Doc. No. 49-6 at ¶ 69.)  The Accused

8   Product also includes a "2.35MP RGB 8mm" camera to capture images of a field.  (*Id.* at ¶ 70.)

9   The Accused Product further includes a lighting array composed of "Auxiliary Lighting" and an

10  "External Lighting Trigger" used to activate the array such that it can illuminate an area on the

11  ground.  (*Id.* at ¶ 71.)  The Accused Product then can be mounted on a frame to move across a

12  field, with alternative configurations to allow the frame to be moved by a tractor or within a self-

13  powered robot.  (*Id.* at ¶ 72.)  Dr. Weckler determined that the Accused Product uses software to

14  take images from the camera, identify weeds, and direct a laser to target the weed.  (*Id.* at ¶ 74.)

15  Defendant's founder stated in an interview that the Accused Product's camera sends the image to

16  an "onboard computer" which "runs an AI model" to classify whether the image is showing a

17  weed, identify the weed's location, and direct the laser to the appropriate "kill zone."  (*Id.*; Doc.

18  No. 49-7 at 7–8.)  Based on these structural components, Dr. Weckler concluded that the Accused

19  Product infringed on plaintiff's '948 and '372 patents.

20      On April 8, 2025, plaintiff filed its pending motion for a preliminary injunction seeking to

21  enjoin sales of the Accused Product.  (Doc. No. 49.)  On April 22, 2025, defendant filed its

22  opposition brief and on May 2, 2025, plaintiff filed its reply thereto.  (Doc. Nos. 58, 61.)

23  /////

24  /////

---

[5]  Plaintiff addressed this lack of a physical inspection at the hearing, indicating that it had
25  requested core technical documentation and a physical inspection of the Accused Product but had
26  not been able to reach agreement with defendant.  Both parties also addressed whether the
   plaintiff could have purchased a unit of the Accused Product to analyze.  In this regard, defendant
27  stated that it had not delivered any units of the Accused Product and would deliver the first such
28  units the week after the hearing.

**LEGAL STANDARD**

"The proper legal standard for preliminary injunctive relief requires a party to demonstrate 'that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)); *see also Ctr. for Food Safety v. Vilsack*, 636 F.3d 1166, 1172 (9th Cir. 2011) ("After *Winter*, 'plaintiffs must establish that irreparable harm is likely, not just possible, in order to obtain a preliminary injunction.'") (quoting *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011)).  The Ninth Circuit has also held that an "injunction is appropriate when a plaintiff demonstrates . . . that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor." *All. for the Wild Rockies*, 632 F.3d at 1134–35 (quoting *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (*en banc*), *overruled on other grounds by Winter*, 555 U.S. 7).[6]  The party seeking the injunction bears the burden of proof as to each of these elements. *Klein v. City of San Clemente*, 584 F.3d 1196, 1201 (9th Cir. 2009); *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) ("A plaintiff must do more than merely allege imminent harm sufficient to establish standing; a plaintiff must *demonstrate* immediate threatened injury as a prerequisite to preliminary injunctive relief.").  Finally, an injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22.

**DISCUSSION**

**A.     Likelihood of Success on the Merits**

"To establish a likelihood of success on the merits, 'a patentee . . . must demonstrate that it will likely prove infringement of one or more claims of the patents-in-suit, and that at least one

---

[6]  The Ninth Circuit has found that this "serious question" version of the circuit's sliding scale approach survives "when applied as part of the four-element *Winter* test." *All. for the Wild Rockies*, 632 F.3d at 1134.  "That is, 'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Id.* at 1135.

of those same allegedly infringed claims will also likely withstand the validity challenges presented by the accused infringer." *Apple, Inc. v. Samsung Elecs. Co.*, 877 F. Supp. 2d 838, 857–58 (N.D. Cal. 2012) (internal quotation marks omitted) (quoting *AstraZeneca LP v. Apotex, Inc.*, 633 F.3d 1042, 1050 (Fed. Cir. 2010)), *reversed on other grounds by*, 695 F.3d 1370 (Fed. Cir. 2012). Plaintiff bears the burden to demonstrate that its success in establishing infringement is more likely than not. *Pavemetrics Sys. v. Tetra Tech, Inc.*, No. 2:21-cv-01289-MCS-MAA, 2021 WL 2548959, at *4 (C.D. Cal. Apr. 15, 2021); *see also Maxwell Techs. v. Nesscap, Inc.*, 508 F. Supp. 2d 837, 843 (S.D. Cal. 2007) (finding that the burden in establishing infringement at the preliminary injunction stage is by a preponderance of the evidence). Plaintiff also bears the burden to demonstrate that its infringement claim "will likely withstand defendant's challenges to the validity and enforceability of those patents." *Open Text, S.A. v. Box, Inc.*, 36 F. Supp. 3d 885, 891 (N.D. Cal. 2014).

"Because a patent is presumed valid, an alleged infringer must establish invalidity by clear and convincing evidence at trial. . . . At the preliminary injunction stage, the accused infringer similarly bears the burden to present evidence of invalidity. . . . However, rather than clear and convincing, the accused infringer need only establish a 'substantial question' of invalidity." *Id.* (citing *Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1376 (Fed. Cir. 2009) and *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1358 (Fed. Cir. 2001)). "[T]he burden is on the [defendant] to come forward with evidence of invalidity, just as it would be at trial. The patentee, to avoid a conclusion that it is unable to show a likelihood of success, then has the burden of responding with contrary evidence, which of course may include analysis and argument." *Titan Tire Corp.*, 566 F.3d at 1377. "[T]he ultimate burden is on a patentee to show that the patent is not invalid." *QBAS Co. v. C Walters Intercoastal Corp.*, No. 10-cv-00406-AG-MLG, 2010 WL 7785955, at *6 (C.D. Cal. Dec. 16, 2010) (citing *Titan Tire Corp.*, 566 F.3d at 1379).

Plaintiff argues that the Accused Product infringes on the '948 and '372 patents because the Accused Product satisfies all elements of at least one claim in each patent. (Doc. No. 49-1 at 16–19.) Defendant contends that the Accused Product lacks at least one element of the claims

7

1  identified by plaintiff as infringed and therefore argues that the Accused Product does not directly

2  infringe on either patent.[7]  (Doc. No. 58 at 10–11.)  Defendant alternatively argues that the

3  patents are invalid because they are anticipated by prior arts or claim only an unpatentable

4  abstract idea.  (*Id.* at 11–21.)  The court will analyze these arguments with respect to the '372

5  patent and, because the court concludes that plaintiff has demonstrated a likelihood of success on

6  its cause of action for infringement of the '372 patent, need not consider whether the '948 patent

7  has also been infringed.[8]

8          1.      Infringement of the '372 Patent

9          In determining whether a claim in a patent is infringed, courts engage in a two-step

10  process:  (1) the court determines "the proper construction of the asserted claim[;]"  and (2)

11  determines "whether the claim as properly construed reads on the accused product or method."

12  *Biomedical Device Consultants & Lab'ys of Colo., LLC v. Vivitro Labs, Inc.*, 689 F. Supp. 3d

13  749, 754 (C.D. Cal. 2023), *aff'd*, No. 2023-2393, 2024 WL 1318251 (Fed. Cir. Mar. 28, 2024).

14  At this second step, the court compares the elements of the claim to the "accused device to

15  determine, as a matter of fact, whether all of the claim limitations are present, either literally or by

16  a substantial equivalent, in the accused device."  *Rosen Ent. Sys., LP v. Eiger Vision*, 343 F. Supp.

17  2d 908, 914 (C.D. Cal. 2004).  Plaintiff need only demonstrate that it will likely prove that at least

18  one claim of the '372 patent is infringed.  *AstraZeneca*, 633 F.3d at 1050.

19  /////

20  /////

21

22  [7]  The court notes that defendant has only responded to plaintiff's argument that claim 1 for each
    of the '948 and '372 patents are infringed but does not address any other claims that plaintiff
23  argues are infringed.  (Doc. No. 49-1 at 16); (*see also* Doc. No. 49-6) (providing a full analysis of
    infringement of each claim).  Defendant states this is because plaintiff "focused" only on claim 1
24  for each of the patents.  (Doc. No. 58 at 9.)  The court, however, need not determine whether
    other claims of each patent are infringed because, as explained in this order, it concludes that
25  plaintiff has demonstrated a likelihood of success on the merits of its claim that the Accused
    Product infringes on claim 1 of the '372 patent.
26

27  [8]  At the hearing, plaintiff and defendant agreed that, in this case, a demonstration of likelihood of
    success as to infringement of one patent was a sufficient basis for the court to grant the injunctive
28  relief requested by plaintiff.

1    As noted above, the parties do not dispute that all terms in claim 1 of the '372 patent

2    should be given their plain and ordinary meaning.  Accordingly, the court will adopt this

3    construction for purposes of resolving this motion.

4    Plaintiff argues that each element in claim 1 of the '372 patent is satisfied by the Accused

5    Product.  (Doc. No. 49-1 at 18–19.)  Plaintiff identifies those five elements as being:  (1) that the

6    Accused Product is a system for "illuminating and targeting a plant in a field[;]"  (2) that it

7    contains a "lighting array comprising a plurality of lights" which are "configured to illuminate a

8    region of interest in the field to reduce or eliminate shadows in the region of interest[;]" (3) that it

9    contains "a detection system comprising a camera configured to obtain an image of the region of

10   interest[;]" (4) that it contains "one or more processors configured to determine a target location

11   of the plant in the region of interest based on the image[;]" and (5) that it contains a "light source

12   configured to emit a light beam . . . to damage or kill the plant."  (Id.)  Defendant argues only that

13   the Accused Product does not practice the second element because it does not contain a "lighting

14   array" but rather uses external lighting.  (Doc. Nos. 58 at 10; 58-1 at ¶ 12.)

15       a.    *Disputed Element*

16   The court finds the bare assertion that the Accused Product does not contain a lighting

17   array to be unpersuasive.  First, plaintiff has attached several photos from publicly available

18   sources to its motion that purport to show the Accused Product in operation.[9]  (Doc. No. 49-6 at

19   175–182.)  These photos appear to show the Accused Product using a lighting array to illuminate

20   a specific region in a field beneath the Accused Product.  (Id.)  Plaintiff has also attached photos

21   of the specifications listed for the Accused Product, which advertises that it has "Auxiliary

22   Lighting" that can provide continuous lighting at 4,000 lumens per square meter and an "External

23   Lighting Trigger."  (Id.)  The court finds that these photos from publicly available sources and

24   promotional materials support the conclusion that the Accused Product includes a lighting array.

---

[9]  These photos are attached to and analyzed in Dr. Weckler's declaration.  (Doc. No. 49-6.)
Defendant does not contest that Dr. Weckler is qualified to offer an expert opinion in this matter.
The court has reviewed his qualifications and agrees that Dr. Weckler is a person with at least
ordinary skill in the relevant art of agricultural engineering.  (Id. at ¶¶ 7–14; Doc. No. 49-6 at
298–333) (detailing Dr. Weckler's qualifications and providing his curriculum vitae).

1   *See FutureLogic, Inc. v. TransAct Techs.*, No. 05-cv-03754-MMM-CT, 2008 WL 11400763, at

2   *3 (C.D. Cal. Mar. 3, 2008) (noting how, based in part on promotional materials that were entered

3   as evidence, the district court had previously concluded that the plaintiff had demonstrated a

4   likelihood of success on the merits as to its infringement claim); *Ameranth, Inc. v. Papa John's*

5   *USA, Inc.*, 946 F. Supp. 2d 1049, 1058 (S.D. Cal. 2013) (finding that the plaintiff had

6   demonstrated that the defendant's system practiced an element of the patent-in-suit based on

7   excerpts from web pages and promotional materials which gave rise to such an inference).

8   Defendant argues that at least some of plaintiff's evidence in this regard pertains to non-

9   commercial prototypes and not the Accused Product. (Doc. No. 58 at 10.) However, defendant

10  does not identify which pieces of evidence it contends are of non-commercial prototypes and only

11  states in conclusory fashion that it lacks the space to address that point in its briefing. (*Id.*) The

12  court therefore concludes that plaintiff's evidence demonstrates that plaintiff will likely prove at

13  trial that the Accused Product practices the element of having a "lighting array comprising a

14  plurality of lights."[10]

15          Defendant's separate argument that the use of a "shroud"[11] prevents infringement is

16  similarly unpersuasive. The court observes that, in advancing this argument, defendant's

17  description of the Accused Product appears to concede that it does include a lighting array to

18  eliminate the shadow cast by the shroud. Defendant's founder states in his declaration that the

19  Accused Product "does not include lights" but that certain implementations must rely "on external

20  lighting" because the Accused Product implements a shroud to obstruct sunlight and uses lighting

21  to illuminate the "relevant area." (Doc. No. 58-1 at ¶ 12.) In Dr. Weckler's reply declaration, he

22

23  [10] Defendant also argues that because the specification of the Accused Product which plaintiff
    cites in support of its motion refers to the lighting apparatus as "Auxiliary Lighting," the lighting
24  is somehow not a part of the Accused Product. (Doc. No. 58 at 10.) The court finds this
    argument to be wholly unpersuasive.
25

26  [11] Defendant clarified at the May 20, 2025 hearing that the "shroud" that the Accused Product
    uses is the opaque rig that the Accused Product is attached to when deployed in a field. It is
27  unclear to the court how using an opaque rig is a "shroud" while the LaserWeeder's use of an
    opaque rig is not. (*Compare* Doc. No. 49-6 at 31 *with* Doc. No. 49-6 at 35) (pictures of the
28  Accused Product and the LaserWeeder G2).

1    states that employing a shroud would "create a shadow, blocking ambient light (*e.g.*, sunlight)

2    from reaching the ground." (Doc. No. 61-2 at ¶ 20.) Therefore, the lighting that defendant's

3    founder concedes "is necessary" would still be "configured to illuminate a region of interest in the

4    field to reduce or eliminate shadows in the region of interest" as disclosed in the '372 patent.

5    (Doc. Nos. 58-1 at ¶ 12; 61-2 at ¶ 20.) Defendant cannot avoid practicing the lighting array

6    element simply by first creating an arbitrary shadow which it then eliminates: The '372 patent

7    discloses the use of the lighting array to eliminate shadows generally. Therefore, the court

8    concludes that plaintiff has demonstrated that it will likely prove at trial that the Accused Product

9    practices the element of having a lighting array "configured to illuminate a region of interest in

10   the field to reduce or eliminate shadows in the region of interest." (Doc. No. 49-1 at 18.)

11                    b.    *Undisputed Elements*

12          "To show literal infringement of a patent, a patentee must supply sufficient evidence to

13   prove that the accused product meets every element or limitation of a claim." *Rohm & Haas Co.*

14   *v. Brotech Corp.*, 127 F.3d 1089, 1092 (Fed. Cir. 1997). Plaintiff bears the burden of

15   demonstrating that it will likely prove infringement. *Vivitro Labs, Inc.*, 689 F. Supp. 3d at 754.

16   At the hearing on the pending motion, defendant stated that although it did not address in its

17   opposition whether the other elements of claim 1 of the '372 patent are practiced by the Accused

18   Product, it now maintained that they are not. Accordingly, the court must consider whether

19   plaintiff has demonstrated that these unaddressed elements are also practiced by the Accused

20   Product.

21          First, plaintiff argues that the Accused Product is a "system for illuminating and targeting

22   a plant in a field." (Doc. No. 49-1 at 18.) In his declaration, Dr. Weckler attaches several photos

23   of the Accused Product, its advertising, and its patent application which indicate that the system is

24   comprised of lighting components and laser components directed to "undesirable plant material."

25   (Doc. No. 49-6 at 165–74.) The court therefore finds that plaintiff is likely to prove at trial that

26   the Accused Product practices this element.

27          Next, plaintiff argues that the Accused Product practices the elements of having "a

28   detection system comprising[] a camera configured to obtain an image of the region of interest"

1  and "one or more processors configured to determine a target location of the plant in the region of

2  interest based on the image." (Doc. No. 49-1 at 18.) Dr. Weckler provides specifications of the

3  Accused Product which indicate that it contains a computer processor designed by NVIDIA and

4  quotations from promotional materials indicating that these processors direct a laser to a target

5  location of an unwanted plant. (Doc. No. 49-6 at 185–93.) He also provides specifications of the

6  Accused Product showing that it contains a camera and advertising materials which indicate that

7  the Accused Product utilizes this camera to take images of a field. (*Id.* at 183–85.) The court

8  therefore finds that plaintiff is likely to prove at trial that the Accused Product practices these two

9  elements as well.

10       Finally, plaintiff argues that the Accused Product practices the element of having "a light

11  source configured to emit a light beam toward the target location of the plant to damage or kill the

12  plant." (Doc. No. 49-1 at 18.) Dr. Weckler provides specifications of the Accused Product and

13  promotional material indicating that the Accused Product includes a laser designed to fire a laser

14  beam at undesired plants. (Doc. No. 49-6 at 193–200.) The court therefore finds that plaintiff is

15  likely to prove that the Accused Product practices this element. Because plaintiff is likely to

16  successfully prove that the Accused Product practices every element of claim 1 of the '372 patent,

17  the court concludes that plaintiff will also likely prove at trial that the Accused Product infringes

18  on the '372 patent.

19       2.  Invalidity

20       Defendant argues that plaintiff has not demonstrated that it is likely to succeed against an

21  invalidity defense[12] as to claim 1 of the '372 patent on the basis that: (1) the elements of claim 1

22  are anticipated by an academic paper called "Designing, modeling, and controlling a novel

23  autonomous laser weeding system" by E.S. Nadimi ("the Nadimi paper"); and (2) the '372 patent

24  is directed towards an abstract idea rather than patent-eligible material and lacks an inventive

---

26  [12] Plaintiff bears the burden of showing that defendant's invalidity defense lacks substantial
    merit: "If, after weighing the available evidence for and against validity, the court determines

27  that the plaintiff fails to show the invalidity defense lacks substantial merit, it necessarily follows
    that the plaintiff cannot show a likelihood of success on the merits." *Open Text, S.A.*, 36 F. Supp.

28  3d at 892.

1  concept sufficient to transform the application into a patent-eligible application.  (Doc. No. 58 at

2  11–13, 18–21.)  Plaintiff replies that the Nadimi paper does not disclose multiple elements within

3  claim 1 of the '372 patent and therefore does not anticipate the '372 patent.  (Doc. No. 61 at 10.)

4  Plaintiff also argues that claim 1 of the '372 patent discloses a combination of elements designed

5  to create technical improvements in systems which kill weeds and is therefore not directed at an

6  abstract idea.  (*Id.* at 12–13.)  The court will address each of these arguments below.

7  　　　　　　　　　a.　　*Anticipation*

8  　　　　Defendant argues that the five elements as described above in claim 1 of the '372 patent

9  are anticipated by the Nadimi paper and that therefore the '372 patent is not valid.  (Doc. No. 58

10  at 11–13.)  Plaintiff does not contest whether the first, third, or fifth elements are taught by the

11  Nadimi paper.  (Doc. No. 61 at 10.)  In particular, plaintiff does not dispute that the Nadimi paper

12  describes a system for illuminating and targeting a plant in the field, that it describes a detection

13  system including a camera to obtain an image of a region of interest, or that it describes a laser

14  designed to damage or kill a plant.  Rather, plaintiff contends that the Nadimi paper does not

15  disclose a lighting array in the sense disclosed by the '372 patent or the use of computer

16  processors to determine a target location of a plant.

17  　　　　"A patent is invalid for anticipation if a single prior art reference discloses each and every

18  limitation of the claimed invention."  *Schering Corp. v. Geneva Pharms.*, 339 F.3d 1373, 1377

19  (Fed. Cir. 2003).  "Anticipation is a factual issue."  *3M Unitek Corp. v. Ormco Co.*, 96 F. Supp.

20  2d 1042, 1046 (C.D. Cal. 2000) (citing *Glaxo, Inc. v. Novopharm, Ltd.*, 52 F.3d 1043, 1047 (Fed.

21  Cir. 1995)).  Anticipation is akin to an infringement analysis in that it requires a two-step analysis

22  of claim construction followed by comparison of the construed claim to the prior art:  "Put

23  simply, that which infringes, if later, would anticipate, if earlier."  *Radware, Ltd. v. F5 Networks,*

24  *Inc.*, 147 F. Supp. 3d 974, 992–93 (N.D. Cal. 2015).  Because the court has already completed

25  claim construction, it will proceed to the second step of comparing that which is disclosed by the

26  Nadimi paper with claim 1 of the '372 patent.

27  　　　　The Nadimi paper is not a patent application but instead a non-peer-reviewed academic

28  paper.  (Doc. No. 58-2 at 5.)  A patent may be invalidated under 35 U.S.C. § 102 if the invention

was "described in a printed publication in this or a foreign country[.]" *Volterra Semiconductor Corp. v. Primarion, Inc.*, 796 F. Supp. 2d 1025, 1060, 1062 (N.D. Cal. 2011) (internal quotation marks omitted) (quoting 35 U.S.C. § 102). Accordingly, an academic paper can invalidate a patent by anticipation. *Id.* The Nadimi paper describes what appears to be an experimental design to determine whether laser weeding is, in principle, implementable on a moving vehicle. (Doc. No. 58-2 at 5) (describing the objectives of the experimental study). The study described an experimental setup where three conveyer belts were arrayed such that one conveyer belt's motion fed into a central conveyer belt to allow plant pots to be placed on the first conveyer belt and reach the central conveyer belt. (Doc. No. 58-2 at 6.) The central conveyer belt then led to a third conveyer belt which would move the plant pots away from the central belt. (*Id.*) The authors of the paper then set up a stationary deflection unit designed to direct a laser beam to specific points and a stationary camera rig along the central conveyor belt. (*Id.*) The camera system was set up to capture images of the central conveyor belt, calculate the central growth point of plants on that conveyer belt, and direct the deflection unit to target the growth point of that plant. (*Id.* at 6–8.) In short, the Nadimi paper described a proof-of-concept experiment to demonstrate that automated laser weeding is possible.

Plaintiff contends that this experimental design does not anticipate claim 1 of the '372 patent and cites Dr. Weckler's reply declaration in support of this contention. (Doc. No. 61-2.) In that declaration, Dr. Weckler states that the Nadimi paper described a software design that analyzes the growth point of a plant to be able to identify what point in three-dimensional space a laser should target to damage or kill the weed. (Doc. No. 61-2 at ¶ 33.) This is in comparison to claim 1 of the '372 patent, which discloses locating a weed within a region of interest in the field and identifying the object it "sees" as a weed. (*Id.*) The specification of the '372 patent clarifies this point by describing a specific embodiment of the detection system which the camera systems and the processors comprise a part of. In that detection system, the '372 patent describes an "object identification module" which uses a machine learning module to identify objects of interest in an image, e.g. weeds in a field. (Doc. No. 49-6 at 402); *see Apple, Inc.*, 877 F. Supp. 2d at 866, 871–72 (discussing embodiments in the patents' specifications to determine whether

1    infringement or anticipation was present).  Dr. Weckler concludes that the Nadimi paper teaches

2    an image-processing technique based on targeting a specific point on a known object whereas the

3    '372 patent discloses an image-processing technique involving "discriminating between weeds

4    and crop, and then precisely determining the weed's spatial position."  (Doc. No. 61-2 at ¶ 33.)

5    In other words, the Nadimi paper described a machine which can target an object and claim 1 of

6    the '372 patent describes a machine which locates, classifies, and then targets objects.  The court

7    is persuaded that this additional functionality is not disclosed by the Nadimi paper.  Accordingly,

8    the court concludes that plaintiff has demonstrated that it is likely that defendant will be unable to

9    prove invalidity by clear and convincing evidence at trial.

10                  b.    *Abstract Idea*

11          Defendant argues that claim 1 of the '372 patent claims an abstract idea and does not

12   contain an inventive concept, and therefore is not patent-eligible under 35 U.S.C. § 101.  (Doc.

13   No. 58 at 18–21.)  Defendant contends that the claimed concept is "straightforward" in that it

14   claims the idea of detecting an unwanted plant and damaging or killing that plant.  (*Id.* at 19.)  It

15   then argues that, in this regard, the claim involves an abstract idea because it is directed towards a

16   result and only invokes generic machinery as a tool to accomplish that goal.  (*Id.*)  Plaintiff retorts

17   that the machine disclosed by claim 1 of the '372 patent is not aimed at an abstract idea because it

18   discloses a specific and tangible system for laser weeding.  (Doc. No. 61 at 12–13.)

19          "Section 101 defines patent-eligible subject matter as 'any new and useful process,

20   machine, manufacture, or composition of matter or any new and useful improvement thereof.'  35

21   U.S.C. § 101.  The Supreme Court has 'long held that this provision contains an important

22   implicit exception:  Laws of nature, natural phenomena, and abstract ideas are not patentable.'"

23   *FairWarning IP, LLC v. Iatric Sys.*, 839 F.3d 1089, 1093 (Fed. Cir. 2016) (quoting *Ass'n for*

24   *Molecular Pathology v. Myriad Genetics, Inc.*, 569 U.S. 576, 589 (2013)).  However, applications

25   of an abstract concept can be patent-eligible.  *Alice Corp. Pty. Ltd. v. CLS Bank Int'l* ("*Alice*"),

26   573 U.S. 208, 217 (2014) ("Applications of [abstract] concepts to a new and useful end, we have

27   said, remain eligible for patent protection.") (internal quotation marks omitted).  "To determine

28   whether a patent claims an abstract concept, courts engage in a two-step inquiry.  First courts

15

1   determine whether the claims at issue are directed to an abstract idea.  . . .  At step two, courts

2   consider the elements of each claim both individually and as an ordered combination to determine

3   whether the claim contains an inventive concept sufficient to transform the claimed abstract idea

4   into a patent-eligible application.”  *Rearden LLC v. TWDC Enters. 18 Corp.*, No. 22-cv-02464-

5   JST, 2023 WL 3579324, at *4–5 (N.D. Cal. Feb. 21, 2023) (internal quotation marks omitted)

6   (quoting *Alice*, 573 U.S. at 217, 221).

7         The first step in this test presents a “legal question . . . [as to] whether the claims as a

8   whole are ‘directed to’ an abstract idea[.]”  *CardioNet, LLC v. InfoBionic, Inc.*, 955 F.3d 1358,

9   1372 (Fed. Cir. 2020).  Courts have noted that a patent is often directed at an abstract idea when

10  the claims’ steps can be “performed in the human mind, or by a human using pen and paper[.]”

11  *See OpenTV, Inc.*, 2015 WL 1535328, at *4 (citing *CyberSource Corp. v. Retail Decisions, Inc.*,

12  654 F.3d 1366, 1372 (Fed. Cir. 2011)).  Courts also consider whether the language of the claim is

13  directed at results without teaching a method for how to accomplish those results.  *See Elec.*

14  *Power Grp. v. Alstom S.A.*, 830 F.3d 1350, 1356 (Fed. Cir. 2016) (“Indeed, the essentially result-

15  focused, functional character of claim language has been a frequent feature of claims held

16  ineligible under § 101.”).

17        Here, defendant argues that claim 1 merely recites a mental process of visually detecting a

18  weed and eradicating it, which indicates that the claim is directed at an abstract idea.  (Doc.

19  No. 58 at 18.)  Plaintiff responds that claim 1’s “specific and tangible system” for laser weeding

20  does not merely recite a mental process, but rather describes a specific system for weeding.  (Doc.

21  No. 61 at 12–13.)  It is plausible that a machine which was designed only to classify plants as

22  weeds would be directed at an abstract idea because it would only involve manipulating existing

23  information to generate additional information.  *See, e.g., Bascom Rsch., LLC v. LinkedIn, Inc.*,

24  77 F. Supp. 3d 940, 949–50 (N.D. Cal. 2015) (holding that a claim which described a process for

25  maintaining and searching a database was not patentable because “storing and using associations

26  between objects” can be performed mentally); *Language Techs. Inc. v. Microsoft Corp.*, 727 F.

27  Supp. 3d 856, 865 (D. Ariz. 2024) (finding that software which collects information and analyzes

28  it “by steps people go through in their minds, or by mathematical algorithms, without more is an

1  abstract idea.") (quoting *Elec. Power Grp.*, 830 F.3d at 1353–54); *Int'l Bus. Machines Corp. v.*

2  *Zillow Grp.*, 549 F. Supp. 3d 1247, 1270–71 (W.D. Wash. 2021) (holding that a software claim

3  which was directed at the abstract idea of retrieving images and evaluating them to determine the

4  "overall condition" of a geographical area was not patent-eligible because it was directed at

5  "enabl[ing] a computer to replicate what humans already know how to do, namely discern

6  images."), *aff'd* 50 F.4th 1371 (Fed. Cir. 2022).  But claim 1 does not only describe the process of

7  classifying a plant as a weed.  It also describes an apparatus that combines with that detection

8  system to do so automatically in a field and to eradicate that weed.  As another district court has

9  observed:

10         Indeed, other district courts that [sic] have rejected § 101 challenges
         where the claims are directed to a physical device that merely
11         incorporates an abstract idea as part of its operation.  *See*
         *POWERbahn, LLC v. Found. Fitness LLC*, No. 3:15-cv-00327-
12         MMD-WGC, 2016 WL 4318978, at *3 (D. Nev. Aug. 11, 2016)
         ("While it is true that the claim includes a formula, the claim is
13         clearly directed at a piece of exercise equipment, and the formula is
         simply one part of the overall scheme.  Including a law of nature as
14         one part of a claim does not transform the entire scheme into an
         abstract idea."); *Polaris Innovations Ltd. v. Kingston Tech. Co.*, 223
15         F. Supp. 3d 1026, 1034 (C.D. Cal. 2016) (noting that the defendant
         had not "cited any case where a court found that a claim for a
16         purportedly novel physical configuration of a piece of computer
         hardware was deemed patent-ineligible because it was merely the
17         embodiment of an abstract process" and distinguishing cases
         involving "patented *processes* running on what the courts found to
18         be generic hardware"); *Baxter Int'l*[, *Inc. v. Carefusion Corp.*,
         No. 15-cv-09986-AJSE, 2016 WL 2770787, at *12 (N.D. Ill. May
19         13, 2016)] (declining defendant's invitation to ignore physical
         components of a claimed invention that were known in the prior art
20         and instead considering the patent as a whole).

21  *Immersion Corp. v. Fitbit, Inc.*, 313 F. Supp. 3d 1005, 1024 (N.D. Cal. 2018).  Because claim 1

22  discloses a physical apparatus, it is not merely reciting a mental process.  *Polaris Innovations Ltd.*

23  *v. Kingston Tech. Co.*, 223 F. Supp. 3d 1026, 1033–34 (C.D. Cal. 2016) (finding that because the

24  patents-in-suit described physical hardware that they did not recite a "mental process").

25  Accordingly, the court rejects defendant's argument that claim 1 is merely reciting the mental

26  process of identifying and eradicating a weed.

27         The court finds plaintiff's contention that the specific combination of tangible elements

28  listed in claim 1 creates a "technical improvement[] in systems for killing weeds[]" to be

1  persuasive.  (Doc. No. 61 at 13.)  Specifically, Dr. Weckler declares that a skilled artisan would

2  recognize from claim 1 that the incorporation of a lighting array would help avoid delays and

3  errors in the detection system described in the claim.  (Doc. No. 61-2 at ¶ 39.)  Claims which

4  "focus on a specific means or method that improves the relevant technology" are directed at

5  patent-eligible subject matter.  *SEMICAPS Pte Ltd. v. Hamamatsu Corp.*, 393 F. Supp. 3d 802,

6  815–17 (N.D. Cal. 2019) (holding that a claim which described a method and apparatus that used

7  a laser to measure faults on an electronic circuit was not directed at an abstract idea because it

8  represented a technological improvement on understood processes).  Moreover, claim 1 describes

9  not just detection of a weed, but also automated eradication of the weed using a laser.  The

10  inclusion of elements of physical technology to not only detect weeds but automatically eliminate

11  them is sufficient to support a finding that the claim not directed at an abstract idea.  *Vineyard*

12  *Investigations v. E. & J. Gallo Winery*, 510 F. Supp. 3d 926, 939–41 (E.D. Cal. Jan. 4, 2021)

13  (holding that the asserted claims which described a system that used in-field data sensors and

14  external data sources to automatically deliver precise amounts of water and chemicals to farmed

15  plants were not directed at an abstract idea because they made specific technological

16  improvements by providing a high level of automation).

17       For these reasons, the court concludes based on the current record that claim 1 is not

18  directed at an abstract idea and is therefore patent-eligible.  The court therefore finds that plaintiff

19  has satisfied its burden of showing that it will likely prevail on defending against defendant's

20  invalidity arguments.  Because plaintiff will likely prevail on its infringement claim and will

21  likely prevail on the above invalidity arguments, the court concludes that plaintiff has shown a

22  likelihood of success on the merits.

23  **B.    Irreparable Harm**

24       The phrase "irreparable harm" is a term of art, meaning a party has suffered a wrong

25  which cannot be adequately compensated by remedies available at law, such as monetary

26  damages.  *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006); *see also E. Bay*

27  *Sanctuary Covenant v. Biden*, 993 F.3d 640, 677 (9th Cir. 2021) ("Irreparable harm is 'harm for

28  which there is no adequate legal remedy, such as an award for damages.'"); *L.A. Mem'l Coliseum*

18

1    *Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980) ("The possibility that

2    adequate compensatory or other corrective relief will be available at a later date, in the ordinary

3    course of litigation, weighs heavily against a claim of irreparable harm.") (quoting *Sampson v.*

4    *Murray*, 415 U.S. 61, 90 (1974)).

5          Following the Supreme Court's decision in *Winter*, a party moving for a preliminary

6    injunction must show that irreparable harm is "likely" to occur. *Ctr. for Food Safety*, 636 F.3d at

7    1172; *All. for the Wild Rockies*, 632 F.3d at 1131. In this regard, a showing of a speculative

8    injury, or mere allegations of an imminent harm that would satisfy standing, are not sufficient to

9    warrant the issuance of a preliminary injunction. *See Caribbean Marine Servs.*, 844 F.2d at 674;

10    *Goldie's Bookstore, Inc. v. Super. Ct. of State of Cal.*, 739 F.2d 466, 472 (9th Cir. 1984). Rather,

11    a plaintiff must demonstrate that they face a real and immediate threat of an irreparable harm.

12    *See Caribbean Marine Servs.*, 844 F.2d at 674; *Midgett v. Tri-Cnty. Metro. Transp. Dist. of Or.*,

13    254 F.3d 846, 850–51 (9th Cir. 2001).

14          Plaintiff argues that, absent this court granting the requested preliminary injunctive relief,

15    it will immediately suffer harm in four ways: (1) loss of market share; (2) loss of opportunity to

16    expand the laser-based weeding market; (3) damage to plaintiff's reputation; and (4) price

17    erosion. (Doc. No. 49-1 at 20.) Plaintiff also argues that monetary damages are insufficient to

18    address this harm because it is unlikely that defendant would be able to satisfy a monetary

19    damages award. (*Id.* at 29.) Defendant contests each of these arguments and also contends that it

20    appears plaintiff does not require injunctive relief because it delayed six months after the filing of

21    its original complaint to seek such relief. (Doc. No. 58 at 21.) The court will address each

22    argument below.

23        1.    Loss of Market Share

24          Plaintiff contends that it currently possesses a "first-mover position in the laser-based

25    weeding market," that allowing defendant to sell infringing products would destroy its

26    exclusivity, and that the market is a two-player market in which any infringing sale is a lost sale

27    for plaintiff. (Doc. No. 49-1 at 20–24.) Given these circumstances, plaintiff argues that the loss

28    of market share constitutes irreparable harm. (*Id.* at 23–24.) Defendant does not appear to

1   contest that the laser-based weeding market is currently a two-player market.  (Doc. No. 58 at 22–

2   23.)  Rather, defendant argues, without citation to evidence or supporting authority, that

3   customers are unlikely to buy plaintiff's product due to its prohibitive cost and therefore sales of

4   the Accused Product will not cause plaintiff to lose market share.  (*Id.*)

5          The Federal Circuit has recognized that the "existence of a two-player market may well

6   serve as a substantial ground for *granting* an injunction—e.g., because it creates an inference that

7   an infringing sale amounts to a lost sale for the patentee[.]"  *Robert Bosch LLC v. Pylon Mfg.*

8   *Corp.*, 659 F.3d 1142, 1151 (Fed. Cir. 2011) (emphasis in original).  "Direct competition in the

9   same market is certainly one factor suggesting strongly the potential for irreparable harm without

10  enforcement of the right to exclude."  *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*,

11  702 F.3d 1351, 1363 (Fed. Cir. 2012).  The use of a marketing strategy designed to take away

12  customers from a competitor in a two-supplier market indicates loss of market share and

13  irreparable harm.  *Conceptus, Inc. v. Hologic, Inc.*, No. 09-cv-02280-WHA, 2012 WL 44064, at

14  *2 (N.D. Cal. Jan. 9, 2012).

15         Plaintiff must substantiate claims of loss of market share with some evidence "because

16  granting preliminary injunctions on the basis of speculative loss of market share would result in

17  granting preliminary injunctions in every patent case where the patentee practices the invention."

18  *DMF, Inc. v. AMP Plus, Inc.*, No. 2:18-cv-07090-CAS-GJS, 2019 WL 1099982, at *12 (C.D. Cal.

19  Mar. 7, 2019) (internal quotation marks omitted) (quoting *Automated Merch. Sys., Inc. v. Crane*

20  *Co.*, 357 F. App'x 297, 301 (Fed. Cir. 2009)).  A plaintiff may show actual loss of market share to

21  satisfy this requirement.  *Id.*; *see also Tee Turtle, LLC v. Kellytoy Worldwide, Inc.*, 522 F. Supp.

22  3d 695, 724–25 (C.D. Cal. 2021) (finding that the plaintiff had not shown irreparable harm where

23  it had not provided any evidence supporting a claim that it had actually lost market share).

24  However, a plaintiff can also satisfy its burden in this regard by presenting evidence indicating

25  that it will lose market share in the future absent an injunction, even prior to the release of a

26  competing product.  *See Apple, Inc. v. Samsung Elecs. Co.*, No. 11-cv-01846-LHK, 2011 WL

27  7036077, at *29 (N.D. Cal. Dec. 2, 2011) (finding that the plaintiff had shown a likelihood of

28  irreparable harm where it was likely to lose customers in a growing market with few players to

1   the alleged infringer), *aff'd in part, rev'd in part on other grounds, remanded*, 678 F.3d 1314

2   (Fed. Cir. 2012); *see also United Therapeutics Corp. v. Liquidia Techs., Inc.*, No. 23-cv-00975-

3   RGA, 2024 WL 2805082, at *11 (D. Del. May 31, 2024) (considering evidence addressing

4   whether the plaintiff's market share would be diminished upon release of a competing product);

5   *United Therapeutics Corp. v. Liquidia Techs.*, No. 1:25-cv-00368-TDS, 2025 WL 1549896, at

6   *12 (M.D.N.C. May 30, 2025) (same).

7        In support of its motion for preliminary injunction, plaintiff provides the declaration of

8   Jim Bergman, the president of a litigation economics firm and a certified financial analyst.  (Doc.

9   No. 49-2 at ¶ 3.)  Mr. Bergman's experience involves the application of economic principles to

10  intellectual property, commercial, and bankruptcy litigation.  (*Id.*)  Mr. Bergman declares that,

11  prior to defendant's entrance into the laser-based weeding market, plaintiff was the only company

12  producing products in that market.  (*Id.* at ¶ 64.)  He bases this conclusion on a market research

13  report published by ReportPrime and a separate news article.  (*Id.*)  Mr. Bergman further declares

14  that defendant's introduction of an "infringing lower-quality product—at significantly lower

15  price" will result in lost sales and could harm plaintiff's efforts to develop this market.  (*Id.* at ¶¶

16  69–71.)  Additionally, he declares that such competition would cause plaintiff to lose its first-

17  mover advantage in the relevant marketplace.  (*Id.*)

18       As a preliminary matter, the court finds that, based on the evidence presented by plaintiff

19  in support of its uncontested contention that the laser-based weeding market is a two-player

20  market, plaintiff has established that fact.  From this evidence, the court may infer that any sale

21  defendant makes is a lost sale for plaintiff.  *Open Text, S.A.*, 36 F. Supp. 3d at 906 ("The

22  existence of a two-player market . . . creates an inference that an infringing sale amounts to a lost

23  sale for patent holder.").

24       Defendant argues that the court should not draw this inference because its prices are so

25  much lower than plaintiff's that they will not directly compete with one another.  (Doc. No. 58 at

26  23.)  Defendant has provided, in the form of a redacted declaration, evidence regarding the price

27  discrepancy between the LaserWeeder product line's redacted price and the Accused Product's

28  price of $15,000.  (Doc. No. 58-1 at ¶ 18.)  The court finds defendant's argument to be

1    unpersuasive.  Defendant has cited no authority in support of this argument.  Indeed, the Federal

2    Circuit has held that a district court erred in concluding that a defendant selling a significantly

3    cheaper, infringing product would not cause a loss of market share to a plaintiff.  *See Douglas*

4    *Dynamics, LLC v. Buyers Prods. Co.*, 717 F.3d 1336, 1344–45 (Fed. Cir. 2013) (finding

5    irreparable harm through loss of market share where a product would "lose some of its

6    distinctiveness and market lure" because competitors could create cheaper products with "similar

7    features"); *see also Merial Ltd. v. Cipla Ltd.*, 681 F.3d 1283, 1306 (Fed. Cir. 2012) (finding that

8    the district court did not err in finding a threat of considerable lost market share where the

9    infringer marketed its product as a "cheaper but otherwise equal alternative."); *see also DMF,*

10    *Inc.*, 2019 WL 1099982, at *12 (finding irreparable harm where the plaintiff had sufficiently

11    demonstrated that the defendant was seeking to displace the plaintiff's products with a cheaper,

12    infringing alternative).

13        Plaintiff also claims that it is a "first mover" in the market and that it would lose the

14    advantages of that position if defendant is permitted to enter the market.  (Doc. No. 49-1 at 21.)

15    Mr. Bergman declares that plaintiff was the "only provider of U.S. laser-based weeding

16    products[]" and that it had a first-mover advantage.  (Doc. No. 49-2 at ¶¶ 64, 70.)  In support of

17    this conclusion, Mr. Bergman relies upon the ReportPrime report and a separate news article.

18    (*See id.* at ¶ 64; *id.* at 120–25); *cf. Open Text, S.A.*, 36 F. Supp. 3d at 908 (finding that the plaintiff

19    did not have a first-mover advantage where the defendant showed that it had operated for multiple

20    years in the same market and the plaintiff had not shown any revenue for at least one year).  The

21    court finds based upon the evidence presented in connection with the pending motion that the

22    entrance of defendant into the market would erode plaintiff's first mover advantage, which in turn

23    contributes to a finding of irreparable harm.  *See 10X Genomics, Inc. v. Bruker Spatial Biology,*

24    *Inc.*, No. 21-cv-00653-MFK, 2024 WL 5201115 at *15 (D. Del. Dec. 23, 2024) (finding that the

25    plaintiff's loss of a first mover advantage qualified as irreparable harm); *see also Bio-Rad Lab'ys,*

26    *Inc. v. 10X Genomics Inc.*, 967 F.3d 1353, 1378 (Fed. Cir. 2020) (finding that the plaintiff was

27    irreparably harmed where it had to rush products to market to overcome an infringer's first-mover

28    advantage); *Incyte Corp. v. Sun Pharm. Indus.*, 135 F.4th 1381, 1383–84 (Fed. Cir. 2025) ("A

1    patentee can be irreparably harmed by an alleged infringer's improper 'head start' and the loss of

2    the 'first mover advantage' because the alleged infringer can capture market share and secure a

3    competitive lead.").  Defendant argues, as it did with respect to plaintiff's two-player market

4    argument, that it does not compete with plaintiff directly because it sells much cheaper products.

5    (Doc. No. 58 at 22–23.)  The court rejects this argument for the same reasons already explained

6    above.  *See Douglas Dynamics, LLC*, 717 F.3d at 1344–45 (finding that the plaintiff would lose

7    various advantages, such as the reputation of being an innovator and the right to exclusivity, if the

8    defendant were permitted to sell a cheaper, infringing product).

9         Plaintiff's contention that the extended lifespan of the laser-based weeding products

10   exacerbates the market share harm is persuasive.  The Federal Circuit has recognized how direct

11   competition in small markets, such as agricultural equipment markets, can contribute to

12   irreparable harm.  *Trebro Mfg., Inc. v. Firefly Equip., LLC*, 748 F.3d 1159, 1170–71 (Fed. Cir.

13   2014) (finding that the plaintiff had shown that it was very likely to lose "significant market

14   share" based on limited sales of a sod harvester due to the tightness of the market).  Here, Mr.

15   Bergman declares that the seasonal nature of agriculture combined with the durability of

16   equipment can create a "sustained decline in market share."  (Doc. No. 49-2 at ¶¶ 78–81.)  The

17   court finds that plaintiff has shown that the entry of defendant into the market will likely cause it

18   a loss of market share and concludes that this supports a finding of irreparable harm.

19        2.    Loss of Opportunity to Expand the Market

20        Plaintiff also argues that defendant's entry into the market hurts plaintiff's ability to

21   expand the market because defendant will harm the market by introducing an inferior product.

22   (Doc. No. 49-1 at 24–26.)  Defendant responds that plaintiff has not "established the necessary

23   premise that L&A's products are ineffective and unsafe."  (Doc. No. 58 at 23.)  Plaintiff replies

24   that it appears that defendant concedes that the Accused Product does not comply with federal

25   regulations governing products incorporating lasers.  (Doc. No. 61 at 16–17.)  Plaintiff appears to

26   argue that this is a violation of federal law which supports the granting of its request for a

27   preliminary injunction.  (*Id.*)

28   /////

23

1    At the May 20, 2025 hearing, the parties addressed whether defendant's products violated

2    any applicable federal regulation.  Plaintiff's counsel argued that 21 C.F.R. § 1040.10 regulates

3    lasers used in laser weeding products, while defendant's counsel argued that § 1040.10 merely

4    regulates laser products in connection with medical devices.  *See* 21 C.F.R. § 1040.10.

5    Regardless of this regulation's applicability, the court finds that plaintiff has provided no

6    evidence that defendant has violated § 1040.10.  (Doc. No. 49-1 at 24–25) (stating only that

7    defendant's "product brochure does not *appear* to include laser-safety certifications) (emphasis

8    added).  Plaintiff has not demonstrated that defendant's products are unsafe so as to harm the

9    market.  Therefore, the court finds that plaintiff has not shown that it will be deprived of an

10   opportunity to expand the market by defendant's sale of the Accused Product.

11       3.    Reputational Damage

12   Plaintiff argues that defendant's marketing of its products has harmed plaintiff's

13   reputation because defendant's founder has made several disparaging comments regarding

14   plaintiff and its products.  (*Id.* at 26–28.)  Defendant responds that the disparaging comments are

15   primarily in relation to plaintiff's legal strategy, which would not be impacted by an injunction

16   preventing the sale of the Accused Product.  (Doc. No. 58 at 25–26.)  In reply, plaintiff claims

17   that the reputational harm instead occurs when defendant implies that plaintiff "has or will copy"

18   defendant's products and that plaintiff's products are ineffective and inferior to defendant's.

19   (Doc. No. 61 at 17.)  In making this general claim, plaintiff has not, however, specifically

20   identified any comments by defendant's founder to this effect.  *See Tee Turtle, LLC*, 522 F. Supp.

21   3d at 725 (finding that conclusory statements of reputational harm are insufficient to support a

22   finding of irreparable harm); c*f. DMF, Inc.*, 2019 WL 1099982, at *14 (finding that reputational

23   harm where the product was disparaged contributed to a finding of irreparable harm).  While it is

24   possible that defendant's founder has made such disparaging comparisons and that they can be

25   found somewhere in the voluminous exhibits plaintiff has attached to its motion, plaintiff has

26   failed to specifically identify any such instance.  *See Indep. Towers of Wash. v. Washington*, 350

27   F.3d 925, 929 (9th Cir. 2003) ("[J]udges are not like pigs, hunting for truffles buried in briefs.")

28   /////

1   (internal quotation marks omitted).  Accordingly, the court finds that plaintiff has not

2   demonstrated that reputational harms would constitute irreparable harm in this case.

3          4.    Price Erosion

4          Plaintiff argues that defendant's undercutting of its prices will lead to price erosion.  (Doc.

5   No. 49-1 at 28–29.)  Defendant argues that price erosion cannot be a basis for a finding of

6   irreparable harm unless plaintiff can show that it has actually already lowered its prices in

7   response.  (Doc. No. 58 at 26–27.)  Plaintiff, in reply, concedes that price erosion has not yet

8   occurred but cites authority from district courts not within the Ninth Circuit indicating that a

9   showing that price erosion is probable is sufficient to establish irreparable harm.  (Doc. No. 61 at

10  18.)

11         Some district courts in the Ninth Circuit have expressed skepticism about whether price

12  erosion can be a basis for a showing of irreparable harm where the price erosion has not actually

13  yet occurred.  *See Tee Turtle, LLC*, 522 F. Supp. 3d at 726 n.8 (citing *Millipore Corp. v. W.L.*

14  *Gore & Assocs., Inc.*, No. 2:11-cv-01453-ES, 2011 WL 5513193, at *11 (D.N.J. Nov. 9, 2011));

15  *see also Zhang v. AKEfit shop*, No. 2:21-cv-09370-AB-RAO, 2022 WL 3012164, at *4 (C.D. Cal.

16  Feb. 14, 2022) ("One example of a product being sold for a lower price, without corresponding

17  evidence about the purported sales or impact on Plaintiff (e.g., lowering prices, otherwise losing

18  sales as a result), is insufficient to show price erosion.") (citing *Millipore Corp.*, 2011 WL

19  5513193, at *11).  Plaintiff identifies a decision in which a district court found that a "fear of

20  price erosion" was "immediate and irreparable" where there was evidence showing that an

21  infringing product was preferred by consumers for being a lower price, even though the patentee

22  in that case did not lower its prices.  *Gonza LLC v. Mission Competition Fitness Equip., LLC*, No.

23  21-cv-00771-ADA, 2021 WL 5657193, at *7 (W.D. Tex. Dec. 1, 2021).  Though the court is

24  persuaded that a substantial likelihood of price erosion could contribute to irreparable harm, *see*

25  *Purdue Pharma L.P. v. Boehringer Ingelheim GMBH*, 237 F.3d 1359, 1368 (Fed. Cir. 2001)

26  (holding that the district court did not err in finding irreparable harm based on the "testimony of

27  the likelihood of price erosion"), the court need not find that plaintiff has made such a showing

28  here because it concludes that plaintiff has established irreparable harm in several other respects.

25

1        5.      Inadequacy of Monetary Damages

2           Plaintiff argues that, based on the founder of defendant's comments on social media that

3    his company is "tiny" and "unfunded," defendant would be unlikely to pay an award for lost

4    profits if plaintiff were to prevail at trial.  (Doc. No. 49-1 at 29.)  Defendant contends that it

5    would likely be able to pay a reasonable royalty rather than a lost profits award and that,

6    accordingly, monetary damages would be sufficient in this case were plaintiff to prevail.  (Doc.

7    No. 58 at 27.)  Defendant also argues, without citation to authority, that its financial hardships

8    have largely been caused by litigation costs incurred in litigating this case which should prohibit

9    plaintiff from arguing that its financial hardships indicate that it will be unlikely to pay monetary

10   damages.  (*Id.*)

11          The court finds that defendant's current financial condition supports a finding of

12   irreparable harm in the absence of injunctive relief.[13]  A showing that defendant is unlikely to be

13   able to pay damages in the event of a judgment supports a finding of irreparable harm.  *See QBAS*

14   *Co.*, 2010 WL 7785955, at *13 ("The fact that any potential trial victory by Plaintiffs would be an

15   empty one when remedies are considered show that irreparable harm to Plaintiffs would result

16   without a preliminary injunction."); *see also Robert Bosch LLC*, 659 F.3d at 1156 (finding it was

17   error for the district court to fail to consider whether the defendant would be able to pay a

18   monetary award as a viable alternative to an injunction); *In re Est. of Ferdinand Marcos, Hum.*

19   *Rts. Litig.*, 25 F.3d 1467, 1480 (9th Cir. 1994) ("We join the majority of circuits in concluding

20   that a district court has authority to issue a preliminary injunction where the plaintiffs can

21   establish that money damages will be an inadequate remedy due to impending insolvency of the

22   defendant[.]").  Here, defendant has conceded that it is in a "precarious financial position."  (Doc.

23   No. 58 at 27.)[14]  Accordingly, because there is a strong possibility that defendant would be unable

24   /////

---

25   [13]  The court observes that defendant's counsel has filed a motion to withdraw as counsel of
26   record on the basis of defendant being "unable to meet its payment obligations."  (Doc. Nos. 52,
     54-1 at ¶ 5.)

27   [14]  Defendant asserts in conclusory fashion that it would be able to pay a reasonable royalty,
28   though does not indicate what that reasonable royalty would be.  (*Id.*)

1    to pay a monetary judgment at the end of this action were plaintiff to prevail, the court finds that

2    defendant's financial condition supports a finding of irreparable harm.

3         6.    Delay

4         Defendant contends that plaintiff could have filed its motion for preliminary injunction

5    either on October 31, 2024 when it filed its initial complaint in this action or in March 2025 after

6    the '948 and '372 patents had been issued.  (Doc. No. 58 at 21.)  Defendant argues that this delay

7    indicates that plaintiff would not suffer irreparable harm in the absence of the granting of an

8    injunction.  (*Id.*)  Plaintiff counters that only the two-month period of delay applies because it

9    could not file its motion seeking a preliminary injunction until those patents were issued.  (Doc.

10   No. 61 at 14.)  Plaintiff argues that it briefly delayed in filing the pending motion because it was

11   uncertain whether defendant would proceed in attempting to sell its infringing products or not

12   after having been put on notice by the complaint that plaintiff believed that the Accused Product

13   would infringe its patents.  (*Id.* at 14–15.)

14        At the May 20, 2025 hearing, defendant's counsel stated that the Accused Product was

15   marketed for sale in the fall of 2023 or the fall of 2024, that no products had been shipped, and

16   that defendant's founder had indicated that the Accused Product would fully launch sometime in

17   March of 2025.  Plaintiff stated that it had engaged in meet and confer efforts to determine

18   whether any units of the Accused Product had yet been shipped to buyers.  Plaintiff informed the

19   court that it had sought to avoid filing the pending motion by first seeking delay of the Accused

20   Product's launch until after infringement contentions had been exchanged.  Defendant confirmed

21   to plaintiff's counsel at that time that no units of the Accused Product had yet shipped but that the

22   parties had not agreed to a delay in the launch of the Accused Product.  Defendant also stated that

23   units of the Accused Product would be delivered in the weeks following the May 20, 2025

24   hearing.

25        Based upon the circumstances presented, any delay on plaintiff's part in filing the pending

26   motion does not support a finding that plaintiff would not suffer irreparable harm in the absence

27   of the granting of a preliminary injunction.  The court finds plaintiff's explanation, that it was

28   attempting to determine whether irreparable harm was imminent before filing its motion and only

1     did so when it in good faith believed that defendant would proceed with attempting to sell an

2     infringing product in the immediate future, to be a reasonable one.  Accordingly, the court rejects

3     defendant's argument that plaintiff's delay in filing the motion weighs against a finding of

4     irreparable harm in the absence of an injunction.

5        The court therefore concludes that plaintiff has met its burden to show that it will suffer

6     irreparable harm absent injunctive relief on the basis that it has shown that it will suffer a loss of

7     market share and because defendant appears insolvent and would be unable to pay damages at the

8     conclusion of this action should plaintiff prevail.

9     **C.**      **Balance of Equities and Public Interest**

10        Plaintiff argues that the balance of equities favors the granting of a preliminary injunction

11     because it will suffer irreparable harm in the absence of injunctive relief, prevention of the sale of

12     defendant's product will preserve the status quo where defendant has not launched its product,

13     and defendant would not be unduly harmed by an injunction.  (Doc. No. 49-1 at 29–31.)

14     Defendant argues that it will suffer substantial financial harm if the requested injunction is

15     granted.  (Doc. No. 58 at 28.)

16        The Federal Circuit has explicitly held that the fact that an injunction against the sale of an

17     infringing product would put an infringer out of business "cannot justify denial of that

18     injunction."  *Windsurfing Int'l Inc. v. AMF, Inc.*, 782 F.2d 995, 1003 n.12 (Fed. Cir. 1996); *see*

19     *also Blackberry Ltd. v. Typo Prods. LLC*, No. 14-cv-00023-WHO, 2014 WL 1318689, at *12

20     (N.D. Cal. Mar. 28, 2014) (finding that the balance of equities favored the granting of an

21     injunction where the defendant argued solely that it would be put out of business if it were unable

22     to continue selling the accused product); *QBAS Co.*, 2010 WL 7785955, at *14 ("And although a

23     preliminary injunction will certainly hurt Defendants' business operations, these operations are

24     precisely what continue to cause irreparable harm to Plaintiffs.").  Accordingly, the court finds

25     that the balance of equities favors granting an injunction because plaintiff would otherwise suffer

26     irreparable harm.

27        "Typically, in a patent infringement case, although there exists a public interest in

28     protecting rights secured by valid patents, the focus of the district court's public interest analysis

1  should be whether there exists some crucial public interest that would be injured by the grant of

2  preliminary relief." *Hybritech Inc. v. Abbott Lab'ys*, 849 F.2d 1446, 1458 (Fed. Cir. 1988).  Here,

3  plaintiff argues that the lack of an injunction would expose the public to an unsafe product "if

4  indeed L&A's products are unsafe." (Doc. No. 49-1 at 31.)  Defendant argues that the public will

5  be worse off if an injunction is granted because the injunction sought by plaintiff would prevent

6  farmers from accessing affordable laser-based weeding technology.  (Doc. No. 58 at 30.)  As the

7  court explained above, plaintiff's claim that defendant's product is unsafe is conclusory, and

8  defendant's argument that farmers would be forced to use chemical herbicides if it is unable to

9  sell the Accused Product is similarly conclusory and is advanced without any supporting

10  evidence.  Accordingly, the court finds that the public  interest factor weighs slightly in favor of

11  plaintiff only insofar as there is a public interest in protecting valid patent rights.

12       Because plaintiff has met its burden to demonstrate that it is likely to prevail on the merits,

13  would suffer irreparable harm in the absence of an injunction, and that the balance of equities and

14  public interest weighs at least slightly in favor of granting an injunction, the court will grant

15  plaintiff's motion for a preliminary injunction.

16  **D.     Bond**

17       Federal Rule of Civil Procedure 65(c) states that the "court may issue a preliminary

18  injunction . . . only if the movant gives security in an amount that the court considers proper to

19  pay the costs and damages sustained by any party found to have been wrongfully enjoined or

20  restrained."  However, "[d]espite the seemingly mandatory language, Rule 65(c) invests the

21  district court with discretion as to the amount of security required, *if any*."  *Johnson v. Couturier*,

22  572 F.3d 1067, 1086 (9th Cir. 2009) (internal quotation marks omitted) (emphasis in original)

23  (quoting *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003)).  "[T]he party affected by the

24  injunction [bears the] obligation of presenting evidence that a bond is needed."  *Zest Anchors,*

25  *LLC v. Geryon Ventures, LLC*, 615 F. Supp. 3d 1206 (S.D. Cal. 2022) (internal quotation marks

26  omitted) (quoting *Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 883

27  (9th Cir. 2009)), *rev'd in part on other grounds*, No. 22-55704, 2023 WL 2783175 (9th Cir. Apr.

28  5, 2023).

1    Here, defendant has raised no argument that plaintiff should be required to post a bond.

2    Accordingly, the court finds that a bond is not necessary in this case and will exercise its

3    discretion to decline to impose one.

4    **E.      Renewed Motion to Withdraw**

5        On April 9, 2025, attorneys Joel C. Lin, Andrew D. Gish, Michael M. Powell, and Ryan

6    K. Iwahashi filed a motion to withdraw as defendant L&A's counsel of record.  (Doc. No. 52.)

7    At the May 5, 2025 hearing, the court denied the motion without prejudice to its oral renewal

8    "immediately upon the hearing on the motion for preliminary injunction."  (Doc. No. 64.)  At the

9    May 20, 2024 hearing on plaintiff's motion for preliminary injunction, defendant's counsel orally

10   renewed their motion to withdraw as counsel of record.  (Doc. No. 72.)  Defendant filed a

11   declaration of its founder in support of that motion.  (Doc. No. 69.)

12       An attorney's withdrawal is governed by Local Rule 182 and the Rules of Professional

13   Conduct of the State Bar of California ("Rules of Professional Conduct").  In this regard, Local

14   Rule 182(d) provides:

15           Unless otherwise provided herein, an attorney who has appeared may
             not withdraw leaving the client *in propria persona* without leave of
16           court upon noticed motion and notice to the client and all other
             parties who have appeared.  The attorney shall provide an affidavit
17           stating the current or last known address or addresses of the client
             and the efforts made to notify the client of the motion to withdraw.
18           Withdrawal as attorney is governed by the Rules of Professional
             Conduct of the State Bar of California, and the attorney shall
19           conform to the requirements of those Rules.

20

21   L.R. 182(d).  Rule 1.16(b) of the California Rules of Professional Conduct provides several

22   grounds upon which an attorney "*may* withdraw from the representation of a client," including if

23   "the client breaches a material term of an agreement with, or obligation, to the lawyer relating to

24   the representation, and the lawyer has given the client a reasonable warning after the breach that

25   the lawyer will withdraw unless the client fulfills the agreement or performs the obligation[.]"

26   Cal. R. Prof. Conduct 1.16(b)(5) (emphasis added).  However, representation shall not be

27   terminated until the attorney "has taken reasonable steps to avoid reasonably foreseeable

28   prejudice to the rights of the client, such as giving the client sufficient notice to permit the client

30

1    to retain other counsel." Cal. R. Prof. Conduct 1.16(d).  "In ruling on a motion to withdraw as

2    counsel, courts consider:  (1) the reasons why withdrawal is sought; (2) the prejudice withdrawal

3    may cause to other litigants; (3) the harm withdrawal might cause to the administration of justice;

4    and (4) the degree to which withdrawal will delay the resolution of the case."  *Beard v.*

5    *Shuttermart of Cal., Inc.*, No. 3:07-cv-00594-WQH-NLS, 2008 WL 410694, at *2 (S.D. Cal. Feb.

6    13, 2008).

7         Local Rule 183 further provides that "[a] corporation or other entity may appear only by

8    an attorney."  L.R. 183(a).  "While individuals may appear *in propria persona*, corporations and

9    other entities may appear only through an attorney; an unrepresented entity cannot file any

10   pleadings, make or oppose any motions, or present any evidence to contest liability."  *Caveman*

11   *Foods, LLC v. jAnn Payne's Caveman Foods, LLC*, No. 2:12-cv-01112-WBS-CKD, 2015 WL

12   6736801, at *2 (E.D. Cal. Nov. 4, 2015) (citing *Rowland v. Cal. Men's Colony*, 506 U.S. 194,

13   202 (1993)).

14        Here, defendant's counsel has represented that defendant has been unable to pay its

15   invoices under its fee agreement with counsel.  (Doc. No. 54 at 3.)  Defendant's counsel agreed to

16   a payment plan with defendant and warned defendant that it would be unable to "continue the

17   representation indefinitely if L&A could not satisfy its obligations."  (*Id.*)  Defendant failed to

18   meet the terms of the agreed upon payment plan whereupon counsel notified defendant that they

19   intended to file a motion to withdraw.  (*Id.*)  Defendant, at that time, gave consent to the

20   withdrawal.  (*Id.*)  Defendant's counsel has also described its efforts in contacting multiple law

21   firms to find substitute counsel for defendant that have proved unsuccessful.  (Doc. No. 54-1 at ¶

22   7.)  The court denied counsel's initial motion to withdraw on the basis that defendant would be

23   prejudiced by the default which would automatically accompany withdrawal of counsel as a

24   corporate defendant while the motion for preliminary injunction was pending.  (Doc. No. 64.)

25   The court further expressed concern over whether defendant was fully aware of the consequences

26   of withdrawal and "requested [a] supplemental declaration that clearly states that [defendant] has

27   been advised that [it] cannot represent [itself] in this action."  (*Id.*)  Defendant has since filed a

28   declaration of its founder in support of counsel's renewed motion to withdraw stating that

1    defendant is aware that it will "'automatically lose' the case" if it is unable to timely secure

2    substitute counsel.  (Doc. No. 69 at ¶ 5.)

3          The court finds that defendant's counsel has complied with the applicable Local Rules and

4    that there is good cause to withdraw based on defendant's breach of the fee agreement.  *See*

5    *Integrity Bus. Partners, LLC v. DB Asset Grp.*, No. 2:21-cv-01187-KJM-KJN, 2022 WL

6    2125686, at *1 (E.D. Cal. May 17, 2022) ("Material breach of a fee agreement is good cause for

7    withdrawal.").  Additionally, the court finds good cause in that defendant has consented to its

8    counsel's withdrawal while aware of the potential consequences of that withdrawal.  *Shepard v.*

9    *Kelso*, No. 2:20-cv-01445-KJM-JDP (PC), 2023 WL 7308416, at *3 (E.D. Cal. Oct. 10, 2023).

10    The court also finds that defendant's counsel have taken reasonable steps to prevent prejudice to

11    their client, such as attempting to identify potential substitute counsel and ensuring that their

12    client was aware of the potential consequences of failing to obtain substitute counsel.  *Cf.*

13    *Chapman v. Ramada Inn, Vallejo*, No. 2:16-02415-KJM-DB, 2019 WL 13258030, at *2 (E.D.

14    Cal. Mar. 11, 2019) (finding that counsel had not taken reasonable steps to avoid prejudice where

15    they had not attempted to locate substitute counsel or advise their client of the consequences of

16    withdrawal).  Accordingly, the court will now grant defendant counsel's renewed motion to

17    withdraw as defendant's counsel of record.

18    **CONCLUSION**

19          For the reasons above,

20        1.    Plaintiff's motion for preliminary injunction (Doc. No. 49) is GRANTED.  The

21            court orders that:

22            a.    Defendant, and any acting in concert with it, is restrained and enjoined

23               from manufacturing, using, offering for sale, or selling within the United

24               States, or importing into the United States the Accused Product or any

25               product incorporating the Accused Product.

26            b.    Within five (5) business days of the date of entry of this order, defendant

27               shall provide notice of this order to any affiliates, subsidiaries, officers,

28               agents, servants, representatives, and attorneys, and all those acting in

1        concert or participating with them, that are involved in any effort to

2        manufacture, use, offer for sale, sell, purchase, promote, advertise, market,

3        service, distribute, supply, or otherwise introduce into the stream of

4        commerce within the United States, or import into the United States either

5        the Accused Product or any product incorporating the Accused Product.

6    2.    No bond shall be required to be posted by plaintiff pursuant to Rule 65(c) of the

7        Federal Rules of Civil Procedure;

8    3.    This preliminary injunction is effective immediately and shall remain in full force

9        and effect through the date on which judgment, if any, as to defendant is entered in

10        this case;

11    4.    The renewed motion to withdraw as counsel for defendant and counter-claimant

12        Laudando & Associates LLC made by attorneys Andrew D. Gish, Joel Lin,

13        Michael M. Powell, and Ryan K. Iwahashi is GRANTED, effective upon

14        defendant's compliance with the court's order regarding defendant's renewed

15        request to seal documents (Doc. No. 70) which requires counsel to file unredacted

16        versions of the documents in question under seal within ten days;

17    5.    Upon defendant's compliance with the court's order regarding defendant's

18        renewed request to seal documents (Doc. No. 70), the Clerk of the Court is

19        directed to terminate attorneys Andrew D. Gish, Joel Lin, Michael M. Powell, and

20        Ryan K. Iwahashi as the counsel of record in this action on behalf of defendant

21        and counter-claimant Laudando & Associates LLC;

22    6.    Attorneys Andrew D. Gish, Joel Lin, Michael M. Powell, and Ryan K. Iwahashi

23        shall comply with all obligations under Rule 1.16(e) of the California Rules of

24        Professional Conduct regarding release of a client's papers and property and return

25        of unearned fees;

26    7.    Within fourteen (14) days of the date of this order, defendant shall file a notice of

27        appearance of its new counsel of record; and,

28    /////

8.      Defendant is warned that its failure to timely file a notice of appearance of counsel will result in an entry of default against it.

IT IS SO ORDERED.

Dated:   **June 12, 2025**

DALE A. DROZD
UNITED STATES DISTRICT JUDGE